## Bessie Hamilton, Appellant, v. Spring Valley Coal Company, Appellee.

### Gen. No. 5,002.

1. MINES AND MINERS ACT—*what essential to sustain action under*. In order to recover under the Mines and Miners Act for injuries sustained or death caused in a mine, it is essential that the wilful violation charged be established by the evidence, and further, that the injury or death resulted from such wilful violation.

2. MINES AND MINERS ACT—*what evidence competent in action under*. In an action under the Mines and Miners Act to recover because of an alleged wilful violation thereof, the testimony of qualified experts in mining matters is competent upon the question as to whether the conditions and surroundings in question were safe.

3. MINES AND MINERS ACT—*what defense to action under*. In an action under the Mines and Miners Act charging a wilful violation of the statute and the maintenance of a dangerous place in the mine in question, it is competent to show that an examination of the alleged dangerous place had been made and reported safe and that the owner had taken certain precautions against accident (the danger being one of the kind as to which the statute did not specify what particular precautions should be taken), which precautions were of the same kind as those taken by other mine owners.

4. MINES AND MINERS ACT—*what questions immaterial in action under*. In an action under the Mines and Miners Act charging wilful violation, questions of the exercise of ordinary care and questions of assumed risk are not material.

5. APPEALS AND ERRORS—*when erroneous rulings will not reverse*. Even though the trial court may have erred in its rulings in the admission of evidence, yet such errors will not reverse if the plaintiff complaining of such rulings did not make out a *prima facie* case.

Action in case for death caused by alleged wrongful act. Appeal from the Circuit Court of Bureau county; the Hon. R. M. SKINNER, Judge, presiding. Heard in this court at the April term, 1908. Affirmed. Opinion filed October 14, 1908. Rehearing denied, additional opinion filed April 21, 1909.

**Statement by the Court.** At about 10 A. M. of March 19, 1906, Edward Hamilton, an employe of the

Spring Valley Coal Company at its mine No. 5 at Dal-zell, in Bureau county, in charge of the drivers of its cars in part of that mine, in some way got under a car of coal weighing about 2,500 pounds and received such injuries that he died next day. His widow brought this action against the coal company to recover damages caused to herself and infant child by said death. At the close of the evidence at the trial plaintiff dismissed all counts of her declaration except the first, third and fourth. The jury returned a verdict for defendant. Plaintiff moved for a new trial. That motion was denied and there was a judgment against plaintiff for costs, from which she appeals.

The mine was operated by the "long wall system." There was in the mine an entry known as the northeast entry. A few hundred feet from the shaft an entry turned off from this known as the north northeast entry. In each of these entries a railroad track was laid whereon cars of coal were hauled from the face of the coal to the bottom of the shaft. At the junction of the north northeast entry with the northeast entry there was a switch, by means of which cars coming out from the face of the coal on either of said entries could thence be drawn along the northeast entry to the shaft, where the coal was taken out of the mine. It was essential to the operation of the mine that pure air should be forced through all the passages where men worked. There was machinery to force the air into the mine, and a shaft where it would go out. The air forced into the mine would return by the shortest route to the shaft where it was permitted to pass out. It was therefore necessary to have many entries closed by trap doors, so arranged as to prevent the air back of them from returning to the outlet by such ways, but which trap doors could be opened temporarily to let the empty and loaded cars pass through. In the north northeast entry about twenty or thirty feet from where its track left the northeast entry as they went to the face of the mine, was a trap door made of wood and set in a

wooden frame. Outside of this wooden frame on the sides and the top dust or coal or mud was put so that the air would not pass around the frame. It was necessary that the bottom of this door should pass over the top of the rail so that it might be opened far enough to permit the passage of cars. The track consisted of rails two and one-half inches high spiked upon ties set in the ground underneath. If the door frame was erected at a place where there was a tie sometimes the side timbers of the door frame were fastened to the tie, which thus became the sill of the door; otherwise a timber was placed underneath the rails as a sill. This, however, would leave an open space, not covered by the door, of two and one-half inches, the height of the rail, and as much more as the door swung above the rail. Much air from back of this door would pass underneath this open space and the door so made would not accomplish the purpose. To fill this space it was the practice in this and other coal mines to place a tie about three inches thick on top of the tie or sill between the rails, cut at the ends so as to permit the wheels of the car to pass through. The door was hung to swing in towards the current of air, which was on the side towards the face of the coal. The bottom of this door was intended to set against the top part of this tie placed above the sill or tie underneath the rail. A piece of canvas was also nailed on the inside of the door at the bottom to prevent a leakage of air. If there were a single door frame it might easily be knocked down if a car ran off the track and struck against its side. There was therefore built in this entry, as at other trap doors in other entries, a second door frame a few feet from the one upon which the door was hung. This second door frame had no piece placed between the rails and had no door, but was fastened to the other frame. This prevented the possibility of knocking down the frame upon which the door was hung. At each door a boy called a trapper was stationed. When he saw or heard either loaded or empty cars coming,

it was his duty to open the door, fasten it open, and then get out of the way. If carloads of coal were being hauled out from the face, it was the duty of the trapper at this door, after fastening the door open, to run out to the switch at the northeast entry and turn it so that the cars could pass on to the shaft. The cars were drawn by mules. It was customary to have four mules draw out a train of six cars, each loaded with about 2,500 pounds of coal. At the place in question, cars going out went on a slight up-grade, and there was a curve where they passed into the northeast entry. The feet of the mules were always liable to dig out the dirt between the ties to a greater or less extent, and especially where the pulling was hard because of an up-grade or a curve, and these places were from time to time filled in by servants of the company. The train of cars drawn by mules was accompanied by a driver. In loading the front car a space was left in the left front corner where the coal was not piled to the same height as the rest of the load, and there the driver could sit. The mules were attached to the car by a chain called a tail chain. In hauling a load up-grade and around a curve there was danger that the mules would lift the front wheels of the front car off the track. To prevent this it was customary for the driver at such places to "ride the chain." There was in front of the car at the bottom of the box a timber extending across the car from side to side and from three to five inches wide, called a bumper. When the driver rode the chain he stood with one foot on the bumper and one foot on the chain while he held on the box of the car with one hand and placed the other hand on the hind mule, the mules traveling single file.

McDonald was driving the team which hauled loads from the face of the coal to the shaft through the north northeast entry on the day in question. Hamilton was in charge of drivers in that part of the mine. As McDonald came out on his third or fourth trip that morning, driving four mules hauling six loaded cars,

his mules stopped just after they had passed through the trap door at the place described, and before the head car had reached the doorway. He had difficulty in starting his team. The trapper had gone to the northeast entry to get out of the way of the cars, and Hamilton was standing there. Hamilton called out to McDonald that he would come and help him, and went in. Hamilton told McDonald to go by the side of the mules and that he would ride the chain. The place was entirely dark except the lamps on the caps of McDonald, Hamilton and the trapper. McDonald went by the side of the mules, saw Hamilton reach up as if to take hold of the box of the car and as if to step upon the bumper. At that instant Hamilton said "All right," which meant for the driver to start his team. McDonald did not see Hamilton get upon the car or know what he did. McDonald started his team, and when they had gone a few feet heard Hamilton call out "Whoa." McDonald stopped his team as soon as he could, assisted by the trapper, who, at his command, stopped the head mule. Hamilton was then found to be under the head car. The mules were detached, help was sent for, men came, ties were brought, and the car was lifted off from Hamilton, and he was removed to the shaft and taken out of the mine to his home, where he died next day from the injuries.

Each of the three counts referred to charged that dangerous conditions existed at this trap door. The first count charged that the mine manager wilfully failed to cause said dangerous places and conditions to be properly marked and danger signals to be displayed thereat, as required by statute. The third count charged that defendant wilfully allowed Hamilton to enter the mine, not under the direction of the mine manager, while dangerous conditions existed that had not been made safe, in violation of the statute. The fifth count charged that defendant wilfully failed to have its examiner inspect all places, and place a mark at all places, where dangerous conditions were discovered, and at the place

in question, and wilfully failed to cause a record thereof to be made, in violation of the statute. Each of these counts originally related merely to the sill underneath this door, and charged that to be the dangerous obstruction, and that thereby Hamilton was caused to fall and receive the injuries. At the close of plaintiff's evidence plaintiff amended each of these counts by charging that there was a rut about eight inches deep on each side of the sill. As so amended, the charge of dangerous conditions and of the manner in which plaintiff alleged Hamilton came to his death was as follows in each of said three counts: ''At the trap door aforesaid in the said mine in the north northeast entry an obstruction had been placed and allowed to remain on said roadway, consisting of two pieces of two by four inch timber spiked and nailed securely to the tie on which the rails of said roadway were laid, and to each other, thereby constituting and making a sill under said trap door, and allowing a rut about eight inches to exist on either side of said sill, which projected and extended from the floor of said entry a distance of about six inches, and extended and projected up in the middle of said roadway, a distance of one and one-half inches higher than and above the top of the rails, constituting the roadway on which the pit cars were hauled, and projected up to within a short distance, to wit: within three inches of the bottom or bed of the pit car as it passed over it, and thereby always creating a danger that a driver when passing over said obstruction in front of his trip of cars his foot would be thereby caught and he be thereby caused to stumble or be dragged under the trip of cars aforesaid—by reason whereof, on to wit, the day aforesaid, while said Edward Hamilton, who in pursuance of his duties as such driver boss or foreman, had been called for to assist and help one Robert McDonald, a driver in said north northeast entry, was assisting the said Robert McDonald to get his trip of cars through and past said trap-door and exposed to the dangerous con-

ditions as aforesaid, and while he the said Edward Hamilton was so assisting in bringing a trip of cars drawn by a four mule team through the trap-door aforesaid, was necessarily and unavoidably caught on the obstruction hereinbefore described, constituting the sill of the trap-door aforesaid, and was thereby necessarily and unavoidably caused to stumble and fall under the said trip of cars," etc.

The evidence for plaintiff tended to show that this piece spiked upon the tie between the rails at the door extended an inch and a quarter or an inch and a half above the rail and that the space on each side of the sill had been dug by the feet of the mules to a depth of five to eight inches below the top of said sill, and that this was a dangerous condition. The evidence for the defendant tended to show that said timber extended above the top of the rails about half an inch, and that this was necessary to prevent the passage of the air when the door was closed, and that a piece that high was the customary construction at such doors in such mines, and that the depth of the hole dug by the feet of the mules on each side of the sill was but slight, and was liable to be found as deep at any place on the main hauling ways at any time, and when filled it might be dug out again in a very short time by the feet of the mules, and that both these depressions, and coal and other obstacles which had fallen from the roof, were liable to be met at any time by those passing along the haulways, and that it was customary to have men go over the mine at night and remove the falls and fill in places which had been dug out by the feet of the mules.

WILLIAM H. HAWTHORNE and JOHN L. MURPHY, for appellant.

McDOUGALL, CHAPMAN & BAYNE, for appellee.

Hamilton v. Spring Valley Coal Co., 149 App. 10.

MR. JUSTICE DIBELL delivered the opinion of the court.

In order to make her case it was necessary for plaintiff to prove not only that said door sill and the depression on either side thereof made by the feet of the mules constituted a dangerous condition within the meaning of the statute concerning mines, but also that Hamilton was caught upon said sill and thereby caused to stumble and fall under the first car. We have carefully read from the record the evidence of each witness who saw Hamilton, either before or after his injury, and we are unable to find any proof from which the jury could reasonably determine that Hamilton caught his foot either in the depression next to the door sill or upon the sill itself. McDonald saw him make a motion as if to step upon the bumper and take hold of the box, and heard him say "all right" at the same instant, and McDonald then turned away and started his team. When the car had gone a few feet, he heard Hamilton call out "Whoa," and stopped the team as soon as he could, with the aid of the trapper stopping the head mule. No one else saw any part of the accident. McDonald found that Hamilton was under the car and sent for help, and several men came and assisted in taking him out. It is clear that the distance from center to center of the two door frames was six feet. One witness said it was five feet eight inches between the door frames, but he doubtless meant "in the clear." Another witness said it was two feet but he afterwards changed it to six. The others said they were six feet apart. The car was seven feet long. It had passed nearly through the outer frame before it stopped. Hamilton's head and shoulders were under the front of that car. One witness said that his head was about ten feet from the door. This is omitted from the abstract. Another testified that the distance from the front of the car as it stood to the door was about ten feet and a half or eleven feet. The proof showed that one of his feet was bent and that the sole of the shoe

on that foot was broken. The wheels of the front car were off the track and it may be that one of those wheels ran over Hamilton's foot and that the car was thereby thrown off the track. While some testimony of one witness places Hamilton's head nearer the door than above stated, yet what we have given is the clear preponderance of the evidence. No one saw his foot near the sill or near the depressions, whatever they were, on either side thereof. No one saw any mark on the sill or on the ground indicating that Hamilton's foot had been caught or dragged there. It may be that his foot was caught on that sill and he was thereby thrown from the car. It may be he made some misstep in attempting to get upon the car or that he failed to get a firm hold of the box and slipped off the chain after the team started. There is no proof that he was higher than any ordinary man and the position of his head ten or eleven feet from the sill tends to indicate that when he fell he was some four or five feet beyond the door. It is to be presumed that he called out the instant he lost his balance or fell. The accident was a deplorable one, but we find nothing in the evidence from which the jury could decide what caused it. We do not think the jury could be permitted to say that, because it was possible that he caught his foot on that sill and was dragged that distance, therefore they would find that such was the manner in which he was injured. If any inference is to be drawn from what McDonald saw it would be that Hamilton took hold of the top of the box, stepped upon the bumper with one foot, and undertook to ride the chain with the other, and that in some unknown way he slipped and fell and went under the car. This would not warrant a verdict for plaintiff under this declaration. We are therefore of opinion that if a verdict for plaintiff had been returned, it must have been set aside for want of proof of the essential allegation that Hamilton was caught upon the obstruction caused by the sill and depressions on each side thereof, and thereby was caused to stumble and fall

under the car. If, therefore, the court erred as alleged in rulings in admitting evidence for defendant and in giving instructions for defendant, still the judgment should not on that account be reversed, inasmuch as plaintiff did not make a *prima facie* case.

Defendant was permitted to prove by qualified experts in mining matters that the conditions and surroundings existing at this trap door were safe. It is urged that this was erroneous. We consider that the rulings of the court in that respect are substantially sustained by Donk Bros. Coal Co. v. Stroff, 200 Ill. 483; Henrietta Coal Co. v. Campbell, 211 Ill. 216, 227, and Kellyville Coal Co. v. Strine, 217 Ill. 516. The ground upon which this evidence is permitted is that ordinary jurymen are not familiar with matters pertaining to the proper operation of coal mines, and that the conditions existing in such a place are not a matter of common knowledge or information.

Defendant was permitted to show that this trap door was constructed and its sill maintained in the method usually adopted in other like mines, and the jury were instructed that if said sill was constructed in the manner in which such doors with sills used for that purpose in coal mines are usually and ordinarily constructed in coal mines by men of ordinary care and caution, then such sill did not constitute a dangerous condition under the law. A distinction, we think, should be drawn between cases where the mine owner has failed to do some specific thing required by statute, and where the alleged dangerous condition is in a matter not specifically prescribed by statute. Where the statute has directed a fence to be built around the top of the mine, or a light to be displayed at the bottom of the mine, or the roadways to be sprinkled when the air in the mine is charged with dust, the operator is not permitted to say, in defense to an action for an injury caused by a failure to comply with such requirements, that he did some other thing which he thought was a sufficient protection of the men in his employ. But the statute con-

tains no directions as to how the sill or the trap door shall be built or how the roadway shall be fitted for travel except that the operator must guard against dangerous conditions. If, therefore, in such a matter, the mine examiner has made an examination as required by statute, and has honestly decided that the conditions are safe, and has so reported, and if the mine manager so believes, and if the conditions are those which prudent mine managers consider safe in their mines, then, though the jury might decide that they were mistaken and that the conditions were in fact dangerous, it is difficult to see how they could decide that the operator had wilfully permitted dangerous conditions to exist. It is a wilful violation of the statute that is charged in this declaration. A wilful violation of the statute is a conscious violation. El Dorado Coal Co. v. Swan, 227 Ill. 586, 591. It therefore seems to us that the rulings upon evidence and instructions of which complaint is made were in the main correct. Perhaps instruction number 28b is inaccurate in not including specifically the knowledge of the mine examiner, but that defect is sufficiently cured by other instructions given, such as Nos. 33, 34 and 35. We do not approve of the allusions in certain instructions to want of care on the part of Hamilton and to the hazard of the business, as those matters are not material in an action for the wilful violation of the statute. Kellyville Coal Co. v. Strine, *supra.* Yet each of these instructions, as given, correctly stated the law, and the allusions did not constitute reversible error. Some other instructions were given which were of doubtful propriety, but we do not think they should reverse a verdict which was required by the condition of the evidence upon the question of how Hamilton's death was caused.

The judgment is therefore affirmed.

*Affirmed.*

Per Curiam: Upon a petition for rehearing appellant insists that there is more evidence in the record

from which an inference may be drawn that the feet of deceased were caught upon the sill of the door, than is stated in the foregoing opinion. If that be so, still the question whether his death was caused in the manner charged in the declaration was a question of fact for the jury. The jury decided that question against appellant and the trial judge approved the verdict. There seems to us a clear preponderance of proof in support of the verdict, and certainly the state of proof would not warrant us in saying that the jury should have found for appellant. We have considered the other points made in the petition for a rehearing and do not find that they show reversible error in the record. The petition for a rehearing is denied.